UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
LISA REYNOLDS,

                Plaintiff,        16 CV 2631 (RRM)(RER)

    -against-

CITY OF NEW YORK, SOPHIA
CARSON, ANDREW VALENZANO,
AFZAL ALI, PAUL ORTIZ, JOEL        **FIRST AMENDED COMPLAINT**
POLICHRON, EMRAH ATES, ANDREW
BLAKE, EDWARD MEJIA, JAMES
SCHUESSLER, JUNER CEVALLOS,
RUPERTO VALENTIN, and JOHN DOE,

                                        **PLAINTIFF DEMANDS**
              Defendants.      **A TRIAL BY JURY**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

        Plaintiff Lisa Reynolds, by her attorneys, Lumer & Neville, as for her complaint against the defendants, allege, upon information and belief, as follows:

## PARTIES, JURISDICTION and VENUE

        1.     At all relevant times herein, plaintiff Lisa Reynolds was a female resident of Kings County, within the City and State of New York.

        2.     At all relevant times herein, defendant City of New York was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York and acts by and through its agencies, employees and agents, including, but not limited to, the New York City Police Department ("NYPD") and its employees.

3. At all relevant times hereinafter mentioned, defendant Sophia Carson, Tax Number 941946, was employed by the City of New York as a member of the NYPD. Carson is sued herein in her individual capacity.

4. At all relevant times hereinafter mentioned, defendant Andrew Valenzano was employed by the City of New York as a member of the NYPD, held the rank of Captain, and was assigned to the Narcotics Division. Valenzano is sued herein in his individual capacity.

5. At all relevant times hereinafter mentioned, defendant Azfal Ali, Tax Number 936116, was employed by the City of New York as a member of the NYPD, held the rank of Sergeant, and was assigned to the Narcotics Division. Ali is sued herein in his individual capacity.

6. At all relevant times hereinafter mentioned, defendant Paul Ortiz, Shield 607, was employed by the City of New York as a member of the NYPD, held the rank of Detective, and was assigned to the Narcotics Division. Ortiz is sued herein in his individual capacity.

7. At all relevant times hereinafter mentioned, defendant Joel Polichron, Shield 4640, was employed by the City of New York as a member of the NYPD, held the rank of Detective, and was assigned to the Narcotics Division. Polichron is sued herein in his individual capacity.

8. At all relevant times hereinafter mentioned, defendant Emrah Ates, Tax Number 942967, was employed by the City of New York as a member of the NYPD, held

the rank of Detective, and was assigned to the Narcotics Division. Ates is sued herein in his individual capacity.

9. At all relevant times hereinafter mentioned, defendant Andrew Blake Shield 27155, was employed by the City of New York as a member of the NYPD, held the rank of Police Officer, and was assigned to the Narcotics Division. Blake is sued herein in his individual capacity.

10. At all relevant times hereinafter mentioned, defendant Edward Mejia, Shield 592, was employed by the City of New York as a member of the NYPD, held the rank of Detective, and was assigned to the Narcotics Division. Mejia is sued herein in his individual capacity.

11. At all relevant times hereinafter mentioned, defendant James Schuessler, Shield 28718, was employed by the City of New York as a member of the NYPD, held the rank of Police Officer, and was assigned to the Narcotics Division. Schuessler is sued herein in his individual capacity.

12. At all relevant times hereinafter mentioned, defendant Det. Juner Cevallos, whose Tax and Shield Numbers are unknown to plaintiff, was employed by the City of New York as a member of the NYPD, held the rank of Detective, and was assigned to the Narcotics Division. Cevallos is sued herein in his individual capacity.

13. At all relevant times hereinafter mentioned, defendant Ruperto Valentin, Tax 927620, was employed by the City of New York as a member of the NYPD,

held the rank of Detective, and was assigned to the Narcotics Division. Valentin is sued herein in his individual capacity.

14. Upon information and belief, defendants John Doe was at all relevant times herein employed by the City of New York as a member of the NYPD and was assigned to the Narcotics Division. The John Doe defendant is believed to a Police Officer named Cantano but plaintiff does not presently have further identifying information. John Doe defendant is sued herein in his/her individual capacity.

15. Upon information and belief, at all relevant times herein each of the individual defendants, including the Doe defendant, were state actors acting in the course of their employment with the NYPD under color of law.

16. Original jurisdiction of this Court is founded upon 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. § 1983.

17. Venue is properly laid in this District pursuant to 28 U.S.C. §1391, *et seq.*, because the majority of the events complained of herein occurred within the Eastern District of New York.

## FACTUAL ALLEGATIONS

18. Shortly after midnight on May 30, 2015, plaintiff was lawfully present inside a location believed to be 69 Lexington Avenue in Kings County in the City and State of New York (the "Premises"), as an invitee.

19. The Premises is understood to be a privately owned building that consists, in relevant part, of a bar or social club.

20. At our about this time, various members of the NYPD, including, upon information and belief, each of the named defendants (collectively, the "individual defendants"), physically forced their way into the Premises.

21. Defendant Valenzano was the supervising officer at the scene, and defendant Ali was the second-in-command.

22. Acting under the direction of Valenzano and Ali, the remaining officersseized, handcuffed, and searched various individuals inside the Premises, including the plaintiff.

23. Plaintiff was not in possession of any narcotics, marijuana, drug paraphernalia, or weapons, nor were there any circumstances that would reasonably support a belief that the plaintiff constructively possessed narcotics, marijuana, drug paraphernalia, or weapons.

24. At no time did the defendants have adequate legal cause to detain, seize, or arrest plaintiff, nor could defendants have reasonably believed that such cause existed.

25. The plaintiff was detained at the Premises for a period of time and then transported to a local NYPD Precinct station house for processing, where she was held until the morning.

26. While plaintiff was at the station house, defendant Carson issued her a Desk Appearance Ticket ("DAT") with the DAT Serial No.: 079-00141, pursuant to Arrest ID K15640238.

27. The top charge set out in the DAT alleged that plaintiff was being charged with violating NY Penal Law § 220.003, which is a misdemeanor charge of criminal possession of a controlled substance.

28. Defendant Carson's issuance of the DAT was based on materially false factual allegations, and Carson knew them to be false at the time she first made them, and at every time thereafter when she repeated them.

29. Although plaintiff was released from defendants' custody in the morning, she was obligated to return to Court on June 26, 2015, pursuant to the DAT issued by defendant Carson.

30. Carson, upon information and belief, forwarded the false allegations to the Kings County District Attorney ("KCDA") in order to justify the arrest and to sustain the plaintiff's criminal prosecution for the purpose of obtaining her conviction..

31. Unbeknownst to the plaintiff, the KCDA declined the plaintiff's prosecution.

32. Plaintiff was later informed that the charges were declined when she appeared in Kings County Criminal Court.

33. Upon information and belief, the defendants arrested every person they found inside the Premises that evening and caused each of them to be criminally charged, regardless of whether probable cause for their arrest existed.

34. Upon information and belief, at least nine other individuals inside the Premises were arrested by the defendants.

35. Upon information and belief, with respect to at least six of the nine other people arrested, the KCDA either agreed to dismissals of the criminal prosecutions, or simply declined to prosecute in the first instance.

36. At all times relevant herein, each of the individual defendants were acting within the scope of his or her employment for the NYPD and the City of New York, and their acts were done in furtherance of the City of New York's interests and without legal justification or excuse.

37. To the extent that any of the individual defendants did not directly participate in the wrongful arrest of the plaintiff, or the fabrication of evidence and communications about said evidence to the KCDA, each such defendant was aware of the false arrest and subsequent misconduct, and failed to intervene or otherwise protect plaintiff and limit the harm inflicted by the other defendants' unconstitutional and wrongful conduct.

## FIRST CAUSE OF ACTION

38. Plaintiff repeats the preceding allegations as though stated fully herein.

39. Each of the individual defendants willfully and intentionally seized, searched and arrested plaintiff without cause, and without a reasonable basis to believe such

cause existed, fabricated evidence to justify and cover up the unlawful arrest by falsifying facts related to the arrest and communicating this falsified or materially inaccurate narrative to the KCDA, or otherwise withholding a truthful, accurate, and complete factual narrative from the KCDA.

40. Those individual defendants that did not actively participate in the unlawful arrest were aware that their fellow defendants lacked probable cause for the arrest and imprisonment of the plaintiff, and understood that a manufactured statement of facts would be presented to the KCDA to justify and cover up the arrest. These officers failed to take reasonable steps to intervene in the other defendants' willful violation of plaintiff's constitutional rights, despite ample opportunity to do so.

41. In so doing, the defendants violated plaintiff's rights under the Fourth, Sixth and Fourteenth Amendments of the United States Constitution.

42. By reason thereof, defendants have violated 42 U.S.C. § 1983 and caused the plaintiff to be deprived of her federal constitutional rights, and to suffer loss of liberty, humiliation and embarrassment, emotional and physical suffering, and mental anguish.

## SECOND CAUSE OF ACTION

43. Plaintiff repeats the preceding allegations as though stated fully herein.

44. The individual defendants' false arrest and assault of plaintiff, as well as their fabrication of evidence against plaintiff to justify their unconstitutional conduct, and

their failure to intervene or otherwise act to prevent or mitigate the harms being inflicted by their fellow defendants, were carried out in accordance with an existing plan or policy created or otherwise condoned by the municipal defendant designed to increase the number of arrests made without regard to probable cause.

45. The purpose of this policy or plan was to generate large numbers of arrests to help the NYPD create a false impression of positive activity by their officers.

46. In addition, members of the NYPD are evaluated, at least in part, on the basis of their "activity" which is measured by the number of arrests made, search warrants secured, and other, similar criteria. Thus, members of the NYPD routinely make arrests and engage in other police activity without sufficient legal cause in order to raise their levels of "activity" and improve the perception of their job performance.

47. The NYPD tracks the number of arrests made by each officer but, in evaluating its officers, does not take into account the outcome of these arrests, even though this information is available to the NYPD. As a result, officers are well aware that (a) they are being evaluated based on, in large part, the number of arrests made, and (b) their supervisors do not care whether these arrests lead to actual criminal prosecutions, much less convictions.

48. More precisely, under this policy or plan, officers are encouraged or pressured to make as many arrests as possible, which has caused and will continue to cause, its officers, including the individual defendants and their colleagues, to make arrests regardless of whether there was any factual basis for the charges. The officer(s) would then

fabricate claims of having seen the person(s) being arrested in possession of weapons or illegal narcotics or otherwise engaged in criminal activity.

49. The purpose of this policy or plan was to generate large numbers of arrests within the individual commands therein, in order to create a false or misleading impression of positive activity by their officers and satisfying internal quotas.

50. In addition, members of the NYPD are evaluated, at least in part, on the basis of their "activity" which is measured by the number of arrests made, summonses issued, and other, similar criteria. Members of the NYPD routinely make arrests and engage in other police activity without sufficient legal cause in order to raise their levels of "activity" and improve the perception of their job performance.

51. Upon information, this policy was in existence as of April 4, 2014, as codified in an October 17, 2011, Police Officer Performance Objectives Operation Order in which NYPD Commissioner Kelly directed all commands that, "Department managers can and must set performance goals" relating to the "issuance of summons, the stopping and questioning of suspicious individuals, and the arrests of criminals."

52. Upon information and belief, that same Operation Order stated, "uniformed members. . . .Who do not demonstrate activities . . . or who fail to engage m proactive activities . . . will be evaluated accordingly and their assignments re-assessed."

53. In the case of *Floyd v City of New York*, 813 F. Supp. 2d 417, 448 (S.D.N.Y.) on reconsideration, 813 F. Supp. 2d 457 (S.D.N.Y. 2011), United States District Judge Shira A. Scheindlin denied the City of New York's motion for summary judgment, in

part, based on evidence that the NYPD had a widespread practice of imposing illegal stop and frisk, summons, and arrest quotas on officers. The evidence cited in *Floyd*, included testimony from various officers, audio recordings of roll call meetings in which precinct commanders issued orders to produce certain numbers of arrests, stops and frisks, and summonses, and a labor grievance on behalf of six officers and one sergeant who were transferred out of the same 75 precinct where plaintiff was arrested for allegedly failing to meet a ten summons-per-month quota. In January 2006, a labor arbitrator found that this same 75 precinct had imposed summons quotas on its officers in violation of New York State labor laws.

54. In another Southern District of New York case, *Schoolcraft v. City of New York*, 10 CV 6005 (RWS), the plaintiff, a police officer assigned to Brooklyn's 81 precinct alleged that precinct commanders and supervisory personnel expressly imposed arrest and summons quotas, and explicitly directed officers to "arrest and summons fully innocent people" and then come up with a justification later.

55. In 2012, Police Officer Craig Matthews commenced *Matthews v. City of New York*, 12 CV 1354 (BSJ) in the Southern District of New York, alleging that his complaints that the existing quota system was leading to unjustified stops and arrests, and thereby causing damage to the department's relationship with the local community led to his termination. There was little dispute that he made these complaints or that they were well founded. *See Matthews v. City of New York*, 779 F.3d 167, 169 (2d Cir. 2015).

11

56. That this plan is still in effect is reflected in a class action suit apparently filed in August 2015 by various police officers alleging that the NYPD still requires officers to meet fixed numerical goals for arrests and court summonses each month, according to a New York Times article published February 18, 2016, which can be found online at http://nyti.ms/1R9FCGu.

57. The policy or plan was kept in effect through the date of plaintiff's arrest, despite the municipal defendant's knowledge that county prosecutors were often not charging the individuals arrested, or otherwise not actively pursuing their prosecutions, or that there was insufficient evidence to justify the arrests and illegal searches, or that the arresting officers were seeking to bolster the arrests with false allegations, and that the prosecutors often had found insufficient cause to justify the imposition of charges or continued prosecution if charges were filed.

58. Indeed, defendants Carson herself was previously sued in a case captioned *Smith, et al., v. City of New York, et al.*, 14 CV 5841 (MKB) (VMS), in the Eastern District of New York, in which the three plaintiffs alleged that, in November 2013, multiple officers, led by Sophia Carson, had obtained a search warrant for their apartment based on fraudulent or deliberately inaccurate information, executed the warrant, and caused the plaintiffs, to be arrested on narcotics charges fabricated by, in part, Carson and her fellow officers in the Narcotics Division. The plaintiffs were detained for one day and the charges were declined, in part, and then dismissed. The defendants caused a child neglect petition to

be filed, but the children were never removed from the home and the petition was dismissed. The City resolved that case by paying the three plaintiffs $180,000.

59. Neither Carson nor any other person involved in the arrest and prosecution of these plaintiffs, and two other individuals as well, were disciplined in any way or otherwise held accountable for their conduct. Indeed, Carson received credit for initiating an investigation that resulted in five arrests, which the NYPD considers a successful operation, regardless of how it was carried out, or the fact that the only prosecutions that actually flowed from these arrests were dismissed on the merits, and the City was forced to expend significant money to avoid further litigation.

60. Such a case is just an individual example and a small, small drop in the ocean of civil rights cases against members of the NYPD in which plaintiffs are claiming that they were falsely arrested and imprisoned or prosecuted based on fabricated evidence.

61. More generally, according to an article in New York Magazine, dated October 10, 2014, the City of New York issued a report reflecting that it paid an average of $33,875 per case to resolve well over 10,000 cases between 2009 and 2014, and that figure did not take into account filed cases that were still pending when the report was compiled. Similarly, the City Comptroller has reported that the City of New York's payments to resolve allegations of misconduct by members of the NYPD had risen from $99 million to $217 million in between 2005 and 2014, as stated on Page 2 in the Comptroller's August 2015 report at http://nylawyer.nylj.com/adgifs/decisions15/083115claims.pdf. While such numbers relate to the NYPD as a whole, they reflect that the City had actual knowledge that

13

its police department was routinely engaging in unconstitutional and unlawful conduct, at least some of which can be attributed to a strict quota policy that compelled officers to focus on the quantity of their arrests at the expense of making good arrests.

62. In October 2011, following a criminal bench trial in New York Supreme Court, Kings County, under indictment number 06314-2008, former NYPD narcotics officer Jason Arbeeny was convicted of planting drugs on two individuals and falsifying arrest reports. Before issuing a verdict of guilty, the trial judge scolded the NYPD for what he described as a "widespread culture of corruption endemic in its drug units." The judge further stated that the testimony demonstrated that the NYPD narcotics divisions maintain a "cowboy culture" and that he was "shocked, not only by the seeming pervasive scope of misconduct but even more distressingly by the seeming casualness by which such conduct is employed."

63. In an Order dated November 25, 2009, in *Colon v. City of New York,* 09-CV-0008 (E.D.N.Y.), the Hon. Jack B. Weinstein stated:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration -- through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department -- there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

14

64. It is thus manifestly clear through the litigation brought in the Eastern and Southern Districts of New York, as well as the many cases filed in New York's State courts, that thousands of civilians have alleged that members of the NYPD have deliberately arrested them without probable cause. Thus, even if the municipal defendant was not the architect of the policies and routinized conduct causing these unlawful arrests, it was certainly on notice of the practice, and by failing to take any meaningful corrective steps, has ratified, endorsed, or otherwise communicated its acceptance of this policy to the officers it employs.

65. Rather than take meaningful steps to reduce and eliminate such misconduct by its officers, the City of New York and the NYPD have instead affirmatively announced a renewed commitment to defending such misconduct. In an article in the New York Times on February 4, 2016, the link to which is http://nyti.ms/1nPv0mO, the City proudly announced that the NYPD had "created a new 40-member legal unit that develops evidence that the Law Department can use to defend lawsuits against the police, and the [Law Department] hired about 30 lawyers to bolster its litigation teams and to try more cases in court." According to this article, these steps were warmly received by police union leaders.

66. The City's stated response to the wave of litigation caused by misconduct on the part of the NYPD is thus directed not at the deliberate and frequent constitutional violations underlying the consequential litigation, but rather at defending such misconduct so that officers can continue to engage in unconstitutional conduct without fear

of being sued or held accountable. In so doing, the City has dispensed altogether with any pretense that such misconduct is not sanctioned, ratified, or otherwise endorsed by the City of New York and the NYPD's executive leaders and supervisory personnel.

67. It is therefore clear that the municipal defendant has not only tolerated, but actively fostered a lawless atmosphere within the NYPD and that the City of New York, at the bare minimum, has been on notice of, and remained deliberately indifferent to, the risk that the undue emphasis on arrest quotas, or minimum activity levels, particularly when coupled with a decidedly and deliberately indifferent level of supervision, would lead to the violation of individuals' constitutional rights in general, and the violation of plaintiff's rights in particular.

68. By reason thereof, the municipal defendant has violated 42 U.S.C. §1983 and caused plaintiff to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, and the loss of his constitutional rights.

## DEMAND FOR A JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, the plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

WHEREFORE, the plaintiff demands judgment against the defendants jointly and severally as follows:

    i.    on the first cause of action, actual and punitive damages in an amount to be determined at trial;

    ii.    on the second cause of action actual damages in an amount to be determined at trial;

    iii.    statutory attorney's fees pursuant to, *inter alia*, 42 U.S.C. §1988 and New York common law, as well as disbursements, and costs of this action; and

    iv.    such other relief as the Court deems just and proper.

Dated:  New York, New York
         February 28, 2017

> LUMER & NEVILLE
> Attorneys for Plaintiff
> 225 Broadway, Suite 2700
> New York, New York 10007
> (212) 566-5060
>
> _____
> Michael Lumer (ML-1947)